# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs December 1, 2015

## STATE OF TENNESSEE v. JORDAN GREGORY LOVE

**Appeal from the Criminal Court for Davidson County**
**No. 2012-A-432     Steve R. Dozier, Judge**

---

**No. M2015-00183-CCA-R3-CD – September 7, 2016**

---

The Defendant, Jordan Gregory Love, was convicted by a Davidson County Criminal Court Jury of two counts of aggravated child abuse of a child eight years of age or less, Class A felonies, and two counts of aggravated child neglect of a child eight years of age or less, Class A felonies. *See* T.C.A. § 39-15-402 (2010) (amended 2011, 2012, 2016). The trial court merged the aggravated child abuse convictions and merged the aggravated child neglect convictions and sentenced the Defendant to concurrent eighteen-year sentences at 100% service. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by limiting his cross-examination of a State's witness, and (3) the trial court erred by admitting the non-testifying codefendants' statements into evidence. We conclude that although the evidence sufficiently established that the victim suffered bodily injury, the evidence is insufficient to show that the victim suffered serious bodily injury and that the victim's injury was inflicted by a dangerous instrumentality. Furthermore, we conclude that the trial court erred by admitting the non-testifying codefendants' statements into evidence. The Defendant's convictions for aggravated child abuse and aggravated child neglect by inflicting serious bodily injury are reversed. Because the trial court erred by admitting evidence at the trial, the case is remanded to the trial court for a new trial on the lesser charges of child abuse and child neglect. The Defendant's convictions for aggravated child abuse and aggravated child neglect by inflicting injury with a dangerous instrumentality are vacated, and the charges are dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed in Part; Vacated in Part; Dismissed in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., J., joined. NORMA MCGEE OGLE, J., filed a concurring and dissenting opinion.

Elaine Heard, Nashville, Tennessee, for the appellant, Jordan Gregory Love.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In March 2012, the Davidson County Grand Jury indicted the Defendant for alternative theories of aggravated child abuse of a child eight years of age or less in Counts 1 and 2 and aggravated child neglect of a child eight years of age or less in Counts 3 and 4.  The grand jury also charged in Count 5 Shakir White,[1] the victim's father; Sheila Barnett; Mario Gayle, the Defendant's stepfather; and Michelle White, the Defendant's mother and codefendant Shakir's aunt, with aggravated child neglect.  In Count 6, the grand jury charged codefendants Barnett, Gayle, and Michelle with being accessories after the fact.  The Defendant and the codefendants were tried jointly in October 2014.

At trial, Larissa Hamilton testified that she was the mother of twins:  a son, K.W., and a daughter, S.W.[2]  The children were born on October 1, 2010.  In June 2011, Ms. Hamilton and codefendant Shakir shared custody, and codefendant Shakir had custody of the children every weekend.  On Saturday, June 11, Ms. Hamilton thought the children were with codefendant Shakir.  That evening, Ms. Hamilton listened to a voicemail message from codefendant Michelle.  In the message, codefendant Michelle told Ms. Hamilton that K.W. had bit his tongue and was crying but was "okay."  Ms. Hamilton was not concerned and did not return the telephone call.  Ms. Hamilton later spoke with codefendant Shakir, who told her that S.W. had kicked K.W.'s mouth while they were napping and had "split" K.W.'s tongue.  Codefendant Shakir said that K.W.'s tongue "bled for about an hour after he got there" but that he did not take K.W. to a doctor because "there was nothing that the doctor could do."

Ms. Hamilton testified that she picked up the children from codefendants Michelle and Gayle's home on the afternoon of Monday, June 13 and was in "complete shock" when she saw K.W.'s tongue.  Ms. Hamilton stated that his tongue "protruded" from K.W.'s mouth and that "whenever he looked at me and [smiled] it opened up in two." Ms. Hamilton immediately took K.W. to his pediatrician, Dr. Harshila Patel.  Dr. Patel consulted a physician at the Vanderbilt University emergency department, but "nothing else was done."  On Tuesday, June 14, Ms. Hamilton contacted the police.

---

[1] Because codefendants Shakir White and Michelle White have the same surname, we refer to them by their first names for clarity.

[2] It is this court's policy to refer to minors by their initials.

- 2 -

Ms. Hamilton testified that K.W. had difficulty eating after the injury and that she wanted a specialist to examine the injury "to make sure [there was] nothing else that we could do to rectify the injury quicker." Dr. Thomas Holzen, an ear, nose, and throat specialist, evaluated K.W. on June 15 or 16 and told Ms. Hamilton that K.W.'s tongue had a "50/50 chance" of healing together. Dr. Holzen provided no further treatment but examined K.W.'s tongue six weeks later to determine if it was healing.

Ms. Hamilton testified that in June 2011, the children were crawling but were not yet walking. K.W. was "pulling up" and was much more active than S.W. After the injury to K.W.'s tongue, food fell out of his mouth, he sat with his tongue protruding from his mouth, and people asked what had happened and if anything could be done to repair his tongue. Ms. Hamilton identified photographs of K.W.'s tongue and said the injury healed after a couple of months.

On cross-examination, Ms. Hamilton acknowledged that it was not unusual for her children to be at codefendants Michelle and Gayle's home. She said that before the injury, K.W. was teething and placed objects in his mouth. K.W. was a happy child. Ms. Hamilton said K.W. was happy to see Ms. Hamilton and was neither crying nor in distress when she picked him up on June 13. Dr. Patel told Ms. Hamilton that Dr. Patel did not believe S.W. had kicked K.W.'s mouth and that Dr. Patel had to notify the Department of Children's Services (DCS) regarding the injury. The next morning, Ms. Hamilton contacted the police. Ms. Hamilton acknowledged that neither Dr. Patel nor Dr. Holzen believed K.W.'s tongue needed sutures.

Dr. Harshila Patel, an expert in pediatric medicine, testified that she had been a pediatrician for twenty-two years and that K.W. had been her patient since his birth. On June 13, 2011, Ms. Hamilton brought him to Dr. Patel's office and told Dr. Patel that according to K.W.'s father, K.W.'s twin sister had kicked K.W.'s mouth. Ms. Hamilton was concerned about K.W.'s tongue and was upset that nobody took K.W. to a hospital. Dr. Patel examined K.W.'s tongue and wrote in her notes that it "was split in the half bottom, centimeter to centimeter and a half." The injury was very recent with no sign of healing, and Dr. Patel did not observe any other injuries inside or outside K.W.'s mouth. She said that she had never seen "a clear-cut, through and through cut on the tip of the tongue." She said that did not know how to treat K.W. and that she contacted a pediatrician at the Vanderbilt University emergency department. The pediatrician told Dr. Patel that tongue injuries usually healed without treatment and that nothing needed to be done.

Dr. Patel testified that she did not think S.W. could have kicked K.W. with enough force to split the tongue and that she saw no evidence outside K.W.'s mouth that he had been kicked. The tip of K.W.'s tongue looked as if it had been cut with a sharp object

and with a front-to-back motion. She concluded that the injury was not accidental. Dr. Patel advised Ms. Hamilton that she was going to contact DCS because such an injury was not normally self-inflicted by a nine-month-old child. On June 16, 2011, Dr. Patel reexamined K.W.'s tongue, which had begun to heal.

On cross-examination, Dr. Patel acknowledged that K.W. did not appear to experience pain and that his tongue was no longer red or swollen when she saw him on June 16. She also acknowledged that according to a scientific article titled "Presenting Characteristics and Treatment Outcomes for Tongue Lacerations in Children," 64% of tongue lacerations occurred at home and that 75% of the lacerations were the result of falls.

Dr. Thomas W. Holzen, an expert in ear, nose, and throat medicine, testified that he examined K.W.'s tongue on June 15, 2011, and that the tongue was split near the tip. At that time, he recommended no treatment because a tongue sometimes healed on its own. He noted that he did not examine K.W. until five days after the injury occurred and stated that "[o]ur training in surgery has always been that if an injury proceeds past a certain amount of time before it's treated then you should not treat it." He said relative to K.W.'s injury, surgery would not have been recommended after twelve to twenty-four hours. Dr. Holzen said, though, that even if he had examined K.W. within that time frame, he would not have recommended surgery because it would have required putting K.W. under general anesthesia, "starving" K.W. for eight hours in preparation for anesthesia, and suturing K.W.'s tongue, which would have "hurt [an] enormous amount." Furthermore, K.W. probably would have had difficulty eating with sutures and would have had to undergo anesthesia again to remove them. Dr. Holzen said that a pediatrician did not possess the required degree of experience or specialization to determine whether surgery was indicated. According to Dr. Holzen's records, a nurse practitioner examined K.W.'s tongue on July 22, and wrote that "the tongue looks great," that "[t]here is barely a dimple where the split was," and that no further treatment was needed.

On cross-examination, Dr. Holzen testified he had treated approximately sixty to seventy tongue injuries. He said that he could not conclude that the failure to obtain medical treatment on June 11 caused any adverse effects to K.W. Dr. Holzen said that in his experience, sutures did not expedite healing to a tongue injury. He said K.W.'s tongue "looked disfigured because it had a slit in it." He said that although K.W. probably experienced initial pain when the injury occurred, K.W. ate from a bottle without difficulty. Dr. Holzen noted K.W. was not malnourished or dehydrated as a result of the injury. Regarding how the injury occurred, Dr. Holzen stated,

- 4 -

[T]here are any number of ways that a tongue could come up with this kind of injury.

. . . .

[T]his doesn't necessarily have to be something extremely sharp. [It] could be something that even is somewhat blunt. Like you could fall, for example, with something in your mouth like the edge of a spoon, the handle of a toy, maybe the rim of the pacifier that keeps you from sucking it all the way in; any number of things that a child might have next to them, or any other person might have next to them if they fell on it or got kicked or anything.

He could not determine how K.W.'s injury occurred and said the injury could have been caused by accidental means. He said that even if he had never previously seen an injury like K.W.'s injury, he would not have felt comfortable immediately concluding the injury was the result of child abuse. He also acknowledged that he was familiar with the mandatory reporting laws for child abuse and that he did not notify DCS in this case. He said that he did not "feel" the injury was the result of intentional child abuse.

Former Metropolitan Nashville Police Officer Jacob Pilarski testified that on June 14, 2011, he was an investigator for the Youth Services Division and that he responded to a call by Ms. Hamilton regarding K.W.'s injury. Mr. Pilarski took photographs of K.W.'s tongue. Ms. Hamilton told Mr. Pilarski that K.W. had been at another residence at the time of the injury and had been in the custody of the Defendant and codefendants Gayle, Michelle, and Barnett.

Mr. Pilarski testified that on June 15, he spoke with codefendant Shakir on the telephone and that codefendant Shakir said that on June 11, he took K.W. and S.W. to codefendant Michelle's home. Codefendant Shakir stayed at the home for part of the day but took his older children to a water park that afternoon. About 5:00 p.m., codefendant Shakir received a telephone call from codefendant Michelle, who stated that K.W.'s tongue had been injured and that codefendant Shakir needed to come home. Codefendant Shakir drove to codefendant Michelle's home and saw that K.W.'s tongue was very swollen. Codefendant Michelle told codefendant Shakir that S.W. had kicked K.W.'s mouth while the children were sleeping. The next day, codefendant Shakir saw the injury more clearly because the swelling had decreased. Codefendant Shakir told Mr. Pilarski that his children had never been harmed while in codefendant Michelle's care but that codefendant Shakir did not believe the injury had occurred in the manner codefendant Michelle claimed.

Mr. Pilarski testified that he also spoke with codefendant Michelle on the telephone and that she stated the Defendant, who was codefendant Michelle's son, brought the children to her after the injury occurred. Mr. Pilarski also spoke with codefendant Barnett on the telephone, and she gave "a very detailed account of the afternoon." According to codefendant Barnett, the children were sleeping on the sofa in the living room while she and codefendants Michelle and Gayle were in the kitchen "getting ready for a catering job." Codefendant Barnett said that she and codefendants Michelle and Gayle heard S.W. crying and went into the living room and that the Defendant was already in the room with the children. Codefendant Barnett said that S.W.'s feet were near K.W.'s head, that blood was on S.W.'s shirt, that K.W. was not crying, and that K.W.'s mouth was full of blood. Codefendant Barnett said codefendant Michelle called Ms. Hamilton and codefendant Shakir, but neither answered. Mr. Pilarski said that codefendant Barnett stated "she was concerned about medical treatment and insurance" and "told me due to her previous involvement in an operating room that she knew [the] emergency room wouldn't do anything because it was in the mouth."

Mr. Pilarski testified that on June 16, he interviewed the Defendant on the telephone. An audio recording of the interview was played for the jury. During the interview, the Defendant stated the following: On June 11, the children were lying on a queen bed in an upstairs bedroom. The Defendant went into the bedroom because S.W. was crying and saw S.W. on top of K.W., "like across his chest." The Defendant picked up S.W. and saw blood on K.W.'s shirt. He took both children downstairs to codefendants Michelle and Gayle, who were in the master bedroom. At that point, the Defendant noticed blood on K.W.'s stomach and leg areas. The Defendant gave one child to codefendant Michelle and the other child to codefendant Gayle. The Defendant did not know how K.W. split his tongue.

Mr. Pilarski testified that he met with the Defendant at codefendants Michelle and Gayle's home on June 22 and that "[t]he events he described were roughly the same." However, the Defendant added "a few details." For example, the Defendant said initially that the children were on the sofa but that he took them upstairs to his bedroom "where he laid them on the bed." The Defendant also stated that he went downstairs briefly to get a towel to clean S.W.'s face, that he heard her "scream out," and that he ran back upstairs to find S.W. on top of K.W. Later during the interview, the Defendant said he had gone downstairs to "fix bottles" for the children. Mr. Pilarski examined the Defendant's bedroom and saw what appeared to be blood on a pillow. The Defendant claimed the blood was from K.W.'s mouth. Mr. Pilarski did not find a sharp object in the room that could have cut K.W.'s tongue, and the Defendant never claimed that K.W. had fallen or that K.W. had anything in his mouth that could have caused the injury. The Defendant told Mr. Pilarski that the injury had to have been caused by a tooth. Mr. Pilarski said that he had examined K.W.'s mouth on June 14, that K.W. had one or two

front teeth "just starting to bud through," and that he thought K.W.'s injury was inconsistent with having been caused by a tooth.

Mr. Pilarski testified that after he spoke with the Defendant, he interviewed codefendant Michelle. An audio recording of the interview was played for the jury. During the interview, codefendant Michelle told Mr. Pilarski that the children were on the sofa in the living room and that she called the Defendant into the room to watch them. Less than five minutes later, the Defendant brought the children to her and told her that K.W.'s mouth was bleeding. Codefendant Michelle examined K.W.'s mouth and saw his tongue was cut. Codefendant Michelle said that S.W. had "a little blood on her foot" and that everyone assumed S.W. had kicked K.W.'s mouth. Codefendant Michelle said the children did not leave the living room before K.W. sustained the injury. At that point, the Defendant was heard in the recording saying, "She didn't know, but I took the kids upstairs to lay them down."

Mr. Pilarski testified that he personally interviewed the Defendant on July 18 and confronted the Defendant about the cause of K.W's injury. The Defendant said the injury "looks like someone took a pair of scissors and made a clean cut." However, the Defendant maintained that the injury occurred upstairs while he was downstairs and never offered another explanation for the injury.

Mr. Pilarski testified that he spoke with codefendant Barnett on the telephone on July 19. The recorded interview was played for the jury. During the interview, codefendant Barnett said she was "getting irritated" because she "wasn't even in there." She said that she was in the house but not the room and that "you keep calling me." She stated that she was cooking in the kitchen and that she went into the living room when she heard S.W. crying. The children were on the sofa with the Defendant, and K.W. was bleeding. Codefendant Barnett said that K.W. was not crying, that her story was not going to change, and that she did not know why everyone's story was different. Mr. Pilarski accused codefendant Barnett of "hiding something." Codefendant Barnett was adamant that she did not know anything more than what she had previously told him and that she had no reason to protect anyone.

Mr. Pilarski testified that he spoke with codefendant Gayle on the telephone in September 2011. Codefendant Gayle claimed that he and codefendant Michelle were "getting ready" in their bedroom and that the Defendant was on the sofa with the children. Codefendant Gayle stated that the Defendant came to their bedroom door, was holding the children, and said K.W.'s mouth was bleeding. Codefendant Gayle told Mr. Pilarski that S.W. had blood on her foot and that everyone thought she had kicked K.W.'s mouth.

On cross-examination, Mr. Pilarski acknowledged that "everyone's story was completely different." Codefendants Michelle, Gayle, and Barnett thought the children were on the sofa at the time of the injury. However, Mr. Pilarski did not find any blood on the sofa. Mr. Pilarski believed the Defendant's claim that the children were on the bed but thought the Defendant was "leaving out" information. Mr. Pilarski said that he thought the injury was caused intentionally but acknowledged that the Defendant repeatedly denied abusing K.W.

Codefendant Shakir White testified on his own behalf that he was age thirty-six, had "[s]ome college" education, and was a logistics manager for a communications company. He said that Ms. Hamilton was a "great mother" and that they had three children together: the twins and an older child. On June 11, 2011, codefendant Shakir left the children at codefendants Michelle and Gayle's home. Codefendant Shakir said that he had known codefendant Michelle his entire life, that she was a "motherly" figure to him when he was a child, and that he trusted her.

Codefendant Shakir testified that while the children were at codefendant Michelle's home, he took a few older children to a water park. At some point, he received a voicemail message from codefendant Michelle and returned her call. Codefendant Michelle told him that K.W. had a cut on his tongue and lip, causing codefendant Shakir to return to codefendant Michelle's home. Codefendant Shakir said that when he arrived at the home, K.W. was eating a Popsicle, that the tongue was not bleeding, and that K.W. was not crying. Codefendant Shakir said that when K.W. smiled, the cut on K.W.'s tongue was visible. Codefendant Michelle told codefendant Shakir that she had cleaned and applied something cold to the tongue to reduce the swelling. Codefendant Michelle also told him that she had spoken with "someone" and that "the best thing to do in that situation because a tongue normally heals itself is to make sure that you keep an eye on it and make sure [K.W. is] comfortable; make sure it doesn't swell anymore; keep something cold on his tongue." Codefendant Shakir stated that he was upset and concerned about the injury but that he followed codefendant Michelle's advice because he had received a deep cut to the side of his tongue in an automobile accident in 1999, which healed without stitches. K.W. felt uncomfortable with the cut on his tongue but was calm. The next morning, the swelling had decreased, and codefendant Shakir did not observe any bleeding or signs of infection. Codefendant Shakir thought K.W. was "okay."

Codefendant Shakir testified that he was told the children were upstairs when the injury occurred. He said that S.W. had blood on her heel or sock and that everyone thought she may have kicked K.W.'s mouth. Codefendant Shakir had no reason to think someone had intentionally harmed K.W. Codefendant Shakir later spoke with Mr. Pilarski and told him that "nobody saw it happen." Mr. Pilarski asked codefendant

Shakir for details, but codefendant Shakir could not provide any. Codefendant Shakir said he never told the officer that he suspected someone had intentionally cut K.W.'s tongue. Codefendant Shakir denied telling Ms. Hamilton that K.W.'s tongue bled for one hour and said he never saw K.W.'s tongue bleed. He said that at the time of the trial, K.W.'s tongue had been healed for several years.

On cross-examination, codefendant Shakir testified that the Defendant, who was age eighteen at the time of the offense, claimed that the children were upstairs, that the Defendant went downstairs, and that the Defendant heard the children crying. The Defendant also told codefendant Shakir that he ran upstairs and saw blood. Codefendant Shakir said he told Mr. Pilarski, "I don't understand fully how the injury could happen; nobody saw it happen." Codefendant Shakir, though, denied telling Mr. Pilarski that he did not believe S.W. had kicked K.W.'s mouth. Codefendant Shakir said he knew the injury was accidental because he trusted his family and nobody had a reason to hurt K.W. He stated that if K.W.'s condition had worsened after the injury, he would have sought medical treatment.

The remaining defendants did not testify or present any proof. The jury convicted the Defendant as charged in Count 1 of aggravated child abuse resulting in serious bodily injury; Count 2 of aggravated child abuse accomplished with a dangerous instrumentality; Count 3 of aggravated child neglect resulting in serious bodily injury; and Count 4 of aggravated child neglect accomplished with a dangerous instrumentality. In Counts 5 and 6, the jury acquitted the codefendants of aggravated child neglect resulting in serious bodily injury and of being accessories after the fact.

## I.     Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. He argues the evidence does not show that the victim suffered serious bodily injury, that a dangerous instrumentality caused the injury, or that he acted knowingly. The State argues that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are

resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-15-402 provides, in pertinent part, as follows:

> (a) A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child abuse, as defined in § 39-15-401(a); child neglect, as defined in § 39-15-401(b); or child endangerment, as defined in § 39-15-401(c) and:
>
> (1) The act of abuse, neglect or endangerment results in serious bodily injury to the child; [or]
>
> (2) A deadly weapon, dangerous instrumentality, controlled substance or controlled substance analogue is used to accomplish the act of abuse, neglect or endangerment[.]
>
> . . .
>
> (b) . . . if the abused, neglected . . . child is eight (8) years of age or less, . . . the penalty is a Class A felony.

Child abuse occurs when a defendant "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id*. § 39-15-401(a) (2010) (amended 2011). Child neglect occurs when a defendant "knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." *Id*. § 39-15-401(b). A person acts "knowingly . . . with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id*. § 39-11-106(a)(20) (2010) (amended 2011, 2014).

- 10 -

The aggravated child abuse and aggravated child neglect statute provides that "serious bodily injury to the child"

> includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

*Id*. § 39-15-402(d). Furthermore, serious bodily injury includes bodily injury that involves the substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty, and a broken bone of a child who is eight years old or younger. *Id*. § 39-11-106(a)(34)(A)-(F); *see* 7 T.P.I—Crim. 21.01(c) (19th ed. 2015). Bodily injury is defined as "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(a)(2); *see* 7 T.P.I—Crim. 21.01(c) (19th ed. 2015). "The distinction between 'bodily injury' and 'serious bodily injury' is generally a question of fact for the jury." *State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997).

In the context of aggravated child abuse and aggravated child neglect, a "dangerous instrumentality" is "any item that, in the manner of its use or intended use as applied to a child, is capable of producing serious bodily injury to a child, as serious bodily injury to a child is defined in this section." T.C.A. § 39-15-402(e).

### A.    Serious Bodily Injury

Relative to the Defendant's claim that the State failed to show the victim suffered serious bodily injury, the Defendant states in his brief that "[t]he prosecution relied heavily upon the 'permanent or protracted disfigurement' language of the definition, but still failed to prove that the injury rose to that level" because the cut was very small, specifically only one to one and one-half centimeters in length, and required no medical treatment. The State argues that the one-month healing period is sufficient to establish a protracted disfigurement.

The record reflects that the injury to K.W.'s tongue, however it was sustained, occurred on June 11. The undisputed evidence showed that the tongue bled initially but that when codefendant Shakir arrived at codefendant White's home on the day the injury occurred, K.W. was smiling and eating a Popsicle. Codefendant Shakir stated that when

- 11 -

he arrived at the home, the bleeding had stopped and that K.W. was not crying. Codefendant Shakir never saw the injury bleed and said that although K.W. appeared uncomfortable, K.W. was calm. The next morning, the swelling had decreased and no signs of an infection were evident, although the tongue had a one to one-and-one-half centimeters cut.

On June 13, two days after the injury occurred, Ms. Hamilton picked up K.W. from codefendant Michelle's home, and Ms. Hamilton said K.W. was happy to see her, was not crying, and was not in distress. Immediately after Ms. Hamilton saw K.W.'s injury, she had K.W. examined by his pediatrician, Dr. Harshila Patel. Although Dr. Patel was an expert in pediatric medicine, she had never seen a similar injury to a child's tongue and did not know how to treat the injury. As a result of her lack of experience with this type of injury, she consulted an emergency medicine pediatric physician with the necessary experience. The physician told Dr. Patel that tongue injuries usually healed without treatment, and Dr. Patel provided no treatment, consistent with the instructions and advice she received. Dr. Patel agreed K.W. was not suffering pain when she examined K.W. on June 13. Dr. Patel said the tongue was no longer red or swollen when she examined K.W. again on June 16, five days after the injury occurred.

Dr. Thomas Holzen, an expert in ear, nose, and throat medicine, was the specialist who examined K.W. on June 15, and who had experience with injuries similar to the one at issue in this case. Dr. Holzen, like the emergency medicine pediatric physician Dr. Patel consulted on June 13, recommended no treatment because tongue injuries generally healed without treatment. Dr. Holzen concluded that surgery was not recommended because surgery would have required general anesthesia, fasting before surgery, and tongue sutures, which created an "enormous amount" of pain. Again, we note that K.W. did not appear to be suffering pain when Ms. Hamilton picked up the child from codefendant Michelle's home. This evidence shows surgery would have been more painful and traumatic than the injury itself. Dr. Holzen's July 22 records reflected that the tongue looked "great," that "barely a dimple" existed where the cut had been, and that no further treatment was needed. Therefore, the cut healed without medical treatment in approximately six weeks.

In *State v. Farmer*, 380 S.W.3d 96 (Tenn. 2012), our supreme court discussed the necessary proof for establishing serious bodily injury. The victim in *Farmer* suffered a gunshot wound to the leg while fleeing the scene of a robbery. *Id.* at 99. The evidence at the trial established that the victim did not know immediately that he had been shot and discovered the gunshot wound after fleeing and noticing a hole in his pants. *Id.* at 101. The victim described the gunshot wound as "a straight shot, you know, just tore straight though" and said he initially did not feel any pain because of the adrenaline. *Id.* The victim stated that at the hospital, the medical staff cleaned the wound, took x-rays, and

discharged him "within an hour or so" with pain medication. *Id.* The victim had no complications, and the injury had healed fully by the time of the trial. *Id.*

In analyzing whether the victim's injury constituted serious bodily injury, our supreme court concluded, based upon the above facts, that no evidence established the victim in *Farmer* suffered protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or a protracted loss or substantial impairment of a function of a bodily injury. *Id.* at 101-02; *see* T.C.A. § 39-11-106(a)(34)(B)-(E); *see also State v. Sims*, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995) (concluding that the pain resulting from a broken nose did not rise to the level of serious bodily injury). Relative to whether the injury created a substantial risk of death, the court noted that no evidence was presented in this regard and stated that "expert medical testimony is frequently of critical importance in establishing this fact." *Farmer*, 380 S.W.3d at 102; *see* T.C.A. § 39-11-106(a)(34)(A). Relative to a protracted or obvious disfigurement, the court noted that the victim did not testify regarding any disfigurement, loss, or impairment. *Farmer*, 380 S.W.3d at 102; *see* T.C.A. § 39-11-106(a)(34)(D). Rather, the victim testified that at the time of the trial, he had no problems with the leg sustaining the gunshot wound. *Farmer*, 380 S.W.3d at 102. The court concluded that the evidence did not support a finding that the victim suffered serious bodily injury.

Although the aggravated child abuse and aggravated child neglect statute includes an enumerated list of bodily injuries that constitute serious bodily injury to a child, the list in nonexhaustive. *See* T.C.A. § 39-15-402(d) (stating that serious bodily injury to a child includes but is not limited to the types of injuries enumerated in the statute). K.W.'s injury is not of a type enumerated as serious bodily injury in the aggravated child abuse and neglect statute, and as a result, we must look to the general definition of serious bodily injury to determine whether the evidence in the present case is sufficient for a jury to have found beyond a reasonable doubt that the victim suffered serious bodily injury.

No evidence presented at the trial reflects that the victim suffered a substantial risk of death, protracted unconsciousness, extreme physical pain, a protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty, or a broken bone. *See id.* § 39-11-106(a)(34)(A)-(C), (E)-(F). Relative to extreme physical pain, we note that although K.W. suffered initial pain when the injury occurred, based upon his crying, K.W. was smiling and eating a Popsicle not long afterward. Ms. Hamilton confirmed that K.W. was not experiencing pain when she picked up K.W. two days after the injury occurred, and pain medication was not prescribed for the injury. Therefore, the only remaining basis for finding K.W. suffered serious bodily injury is whether the victim suffered a protracted or obvious disfigurement, which was the State's focus at the trial.

"'Protracted' is an adjective used to describe something that is delayed or prolonged in time." *State v. Derek Denton*, No. 02C01-9409-CR-00186, 1996 WL 432338, at *5 (Tenn. Crim. App. at Jackson, Aug. 2, 1996) (citing *Merriam Webster's Collegiate Dictionary* 939 (10th ed. 1994); *American Heritage Dictionary* 568 (1975)). We have reviewed photographs of the victim's tongue shortly after the cut occurred and note the photographs show that K.W.'s tongue was split as described by the testimony. The injury would have been disturbing to any parent. However, the evidence reflects that the injury occurred on June 11, that Dr. Patel noted the tongue was no longer red and swollen on June 16, and that Dr. Holzen's July 22 records show that the tongue looked "great," that it had "barely a dimple" where the cut had been, and that no further medical supervision was required. The victim's injury only required observation during a six-week healing period, the victim suffered no complications, and the tongue barely had dimple after it healed. This court has previously concluded that although a scar from a bite mark supported a finding of bodily injury, the scar was not a protracted disfigurement and was insufficient evidence to establish serious bodily injury on this basis. *State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). Although the State offered a photograph of the victim's tongue on June 14, no photographic evidence showed the tongue after it healed. The only evidence of the tongue's condition after healing was that only a small dimple was seen at the July 22 evaluation and that codefendant Shakir noted at the time of the trial, K.W.'s tongue had been healed for several years. Although Ms. Hamilton mentioned food fell from K.W.'s mouth, the expert medical testimony showed that K.W. ate from a bottle without difficulty and was not malnourished or dehydrated. As a result, we conclude that although the evidence sufficiently establishes the victim suffered bodily injury, a rational jury could not have found beyond a reasonable doubt that the injury to K.W.'s tongue constituted serious bodily injury.

### B. Dangerous Instrumentality

The Defendant argues that the State failed to show that a dangerous instrumentality was used to abuse the victim. The State argues that Dr. Patel's credited testimony that the injury was caused by a sharp object and that the injury was non-accidental was sufficient to establish a dangerous instrumentality was used to inflict the injury.

The only witness who concluded that the victim's tongue was cut with a sharp object was Dr. Patel. However, her testimony alone is insufficient to establish beyond a reasonable doubt that the injury was caused by a dangerous instrumentality. Dr. Patel's knowledge of how the injury occurred was mere speculation based upon her admitted lack of experience with this type of injury. Dr. Patel's area of expertise was pediatric medicine, although she had never seen such an injury in twenty-two years of medical

practice. Dr. Patel conceded during her testimony that she had no experience, and the record does not reflect she otherwise had any specialized knowledge or training. Nonetheless, she concluded that the injury was non-accidental and inflicted by a sharp object. We note that her testimony in this regard was also beyond the scope of her expertise. Dr. Patel was not questioned about her experience with suspecting and reporting child abuse, other than her obligation to report any suspicions to law enforcement. She had no firsthand experience in having seen an injury of this nature, and the State failed to establish that she otherwise had any specialized knowledge or training to support an expert opinion that the injury was caused by a dangerous instrumentality. *See* Tenn. R. Evid. 701. Although the jury was free to credit or discredit Dr. Patel's expert testimony regarding pediatric medicine generally, her testimony about how the injury occurred is insufficient to establish beyond a reasonable doubt a dangerous instrumentality was used to cause the injury.

Dr. Holzen, the only medical expert having firsthand experience with injuries similar to the one in this case, testified that K.W.'s injury could have been caused by sharp or blunt objects, by a child's falling with an object in the child's mouth, and by an object's being hit or kicked while in a child's mouth. Although Dr. Holzen stated that the injury could have been caused by non-accidental means, the injury itself did not translate to a conclusion that the injury was non-accidental. Dr. Holzen stated that he would not have been comfortable concluding the injury was the result of child abuse even if the victim's injury been his first experience with an injury like the one in this case. Dr. Holzen said that the injury could have been caused by accidental means and that he did not feel the injury was the result of child abuse. Furthermore, no proof shows what, if any, instrument was used to inflict the injury. The investigating officer did not inspect the Defendant's bedroom until June 22, eleven days after the injury occurred, and the officer found no instruments that could have caused the injury. Insufficient proof existed to show the injury was inflicted by a dangerous instrumentality. The Defendant's convictions for aggravated child abuse and aggravated child neglect accomplished with a dangerous instrumentality are vacated, and the charges are dismissed.

### C. Knowing Conduct

The Defendant argues that the State failed to show he engaged in knowing conduct. The State responds that "the nature of the injury itself proclaims that its infliction was knowing."

Although Dr. Patel was not an expert in child abuse and her testimony alone is insufficient to establish that the injury was non-accidental and the result of knowing conduct, Dr. Holzen testified that K.W.'s injury could have been caused by either non-accidental or accidental means. This testimony provided sufficient evidence for a jury to

have concluded the injury was the result of non-accidental conduct, and therefore, was knowing relative to the conduct involved or to the circumstances surrounding the conduct. *See* T.C.A. § 39-11-106(a)(20). The Defendant is not entitled to relief on this basis.

However, we will address the argument in the State's brief that even if the injury were caused by accidental means, the jury could have reasonably concluded that

> some sharp object was left in proximity to the child where the child was injured, if not intentionally, then as the result of [the Defendant's] neglect, having left the room while the child was injured. The jury could reasonably conclude that [the Defendant] knew or should have known of the danger which ultimately caused the child's injury, and that [the Defendant's] failure to protect and watch over the child was a gross deviation from the standard of care that an ordinary parent or legal custodian of the child would exercise.

We reject this argument. The mental culpability recited by the State only applies to offenses involving child endangerment, not child abuse or neglect. *See* T.C.A. § 39-15-401(c)(1), (2)(A). Child endangerment of a child eight years of age or less is defined as knowingly exposing the child to child abuse or neglect or as knowingly failing to protect the child from abuse or neglect. *Id*. § (c)(1). For the purpose of child endangerment, knowingly

> means the person knew, or should have known upon a reasonable inquiry, that abuse to or neglect of the child would occur which would result in physical injury to the child. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary parent or legal custodian of the child eight (8) years of age or less would exercise under all the circumstances as viewed from the defendant's standpoint.

*Id*. § (c)(2)(A).

For child abuse and child neglect, however, a person's conduct is knowing, in relevant part, "with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id*. § 39-11-106(a)(20); *see* T.C.A. § 39-15-401; -402. Establishing that a defendant's conduct was negligent or reckless is insufficient to support convictions for child abuse, child neglect, aggravated child abuse, and aggravated child neglect. We note that the State's position would potentially support criminal sanctions for all injuries

- 16 -

sustained by young children, regardless of intent and that adopting the State's argument would require lowering the mental culpability level in contravention of the statute.

## II.     Limiting Cross-Examination

The Defendant contends that the trial court erred by prohibiting him from questioning Mr. Pilarski, the investigating officer, about his inappropriate conduct during his tenure as a police officer. The Defendant argues the evidence was admissible pursuant to Tennessee Rule of Evidence 608(b) because it related to Mr. Pilarski's character for truthfulness. The State argues that the trial court properly limited the cross-examination.

The Defendant and the codefendants filed a pretrial motion requesting permission to impeach Mr. Pilarski regarding his altering a police report in another case and his participating in "on-the-job sexual misconduct which eventually resulted in his resignation." In support of the motion, the defendants offered a 2007 Complaint Resolution Proposal, which showed that Mr. Pilarski was disciplined for rewriting an offense report in 2005. According to the proposal, another officer, who was not present for the suspect's arrest, wrote in the original offense report that the arresting officers, one of whom was Mr. Pilarski, had seen the suspect swallow a "dime bag" of white powder. The proposal stated that the suspect was taken to jail, became ill, and later died at a hospital with complications of acute cocaine toxicity as a contributing factor to his cause of death. Mr. Pilarski rewrote the offense report in which he "never mentioned anything about cocaine." The proposal stated that Mr. Pilarski was interviewed; that he said he changed the original report because it claimed he saw the suspect put a bag of white substance in his mouth, which was untrue; and that he threw away the original report. The proposal concluded that Mr. Pilarski should have notified his supervisors about the changes to the original report and recommended that Mr. Pilarski receive a five-day suspension for violating the policy regarding the writing of police reports.

Also in support of the motion, a 2013 Office of Professional Accountability (OPA) report relative to the internal police investigation of a sexual misconduct allegation against Mr. Pilarski showed that Mr. Pilarski admitted engaging in repeated sexual behavior while on duty. A notice of termination of employment form showed that Mr. Pilarski resigned from the police department before the OPA could complete its internal investigation.

At the motion hearing, the State argued relative to the altered police report that Mr. Pilarski "corrected a police report to accurately state the facts that he was reporting" and that "[t]his issue has been addressed multiple times in other courts and . . . has never been permitted to be used to carry the accusations that are being raised by the defense

here." *See State v. Jimmy Jackson*, No. M2011-01077-CCA-R3-CD, 2012 WL 5873506 (Tenn. Crim. App. Nov. 21, 2012). The trial court stated, "I mean, all I am seeing in here is some agreements that [the report was not] written properly according to some general orders. But I don't know whether that would involve truthfulness or untruthfulness[.]" The court noted that the report contained mostly hearsay statements but stated defense counsel could present as witnesses the officers involved as an offer of proof. As to Mr. Pilarski's sexual misconduct, the trial court stated, "I'm not inclined to . . . grant some question about on-the-job sexual misconduct." The record does not reflect the defense made an offer of proof regarding the altered report or the sexual misconduct.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence lies within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee Rule of Evidence 608(b) states, in relevant part, that

> [s]pecific instances of conduct of a witness for the purpose of attacking . . . the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness. . . . The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:
>
> (1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry; [and]
>
> (2) the conduct must have occurred no more than ten years before commencement of the action or prosecution[.]

This court reviews a trial court's ruling under Rule 608(b) under an abuse of discretion standard. *State v. Reid*, 91 S.W.3d 247, 303 (Tenn. 2002).

We conclude that the trial court did not abuse its discretion by prohibiting the Defendant from questioning Mr. Pilarski about his altering the police report. As noted by the trial court, the Complaint Resolution Proposal did not offer an opinion on Mr. Pilarski's character for truthfulness or suggest that he had a reputation for untruthfulness. Moreover, Mr. Pilarski did not acknowledge dishonest conduct in the proposal, instead he claimed that he modified the report because it was inaccurate. The trial court stated that it would consider testimony by the officers involved in the incident, but the Defendant chose not to make an offer of proof. *See* Tenn. R. Evid. 103(a)(2); T.R.A.P. 36(b). Therefore, the Defendant is not entitled to relief on this basis.

Relative to the trial court's prohibiting the Defendant from questioning Mr. Pilarski about his sexual misconduct, the Defendant has not explained how Mr. Pilarski's actions were probative to his character for truthfulness or untruthfulness. Likewise, the report does not offer an opinion on Mr. Pilarski's character for truthfulness. The report reflects that Mr. Pilarski admitted engaging in sexual acts but denied having sexual intercourse. The Defendant did not question Mr. Pilarski at the pretrial hearing and made no offer of proof regarding his proposed cross-examination. *See* Tenn. R. Evid. 103(a)(2); T.R.A.P. 36(b). Therefore, we cannot conclude that the trial court abused its discretion. The Defendant is not entitled to relief on this basis.

### III.    Non-Testifying Codefendants' Statements

The Defendant contends that the trial court erred by admitting the non-testifying codefendants' statements into evidence. He argues the admission of the statements violated *Bruton v. United States*, 391 U.S. 123 (1968), denying his right to confrontation. The State argues that any error was harmless because the Defendant's statement established he was the only adult with the victim immediately before discovering the victim's injury. We conclude that the trial court erred by admitting the codefendants' statements and that the error was prejudicial.

The Confrontation Clause provides a criminal defendant the rights to confront and cross-examine witnesses. *See* U.S. Const. Amends. VI, XIV; Tenn. Const. art. 1, § 9; *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court concluded that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity to cross-examin[e]" witnesses who do not appear at a trial. In *Bruton*, the United States Supreme Court concluded that admitting into evidence a codefendant's statement that implicates a defendant when the codefendant does not testify violates the defendant's right to confrontation. 391 U.S. at 126.

- 19 -

Mr. Pilarski's testified on direct examination that he spoke with Larissa Hamilton and "began to talk to all of the parties involved." Mr. Pilarski testified about the substance of codefendant Shakir's statement. When Mr. Pilarski was asked about codefendant Michelle's statement, codefendant Barnett's counsel objected pursuant to *Bruton*. The trial court questioned the prosecutor about what he intended to ask Mr. Pilarski, and the prosecutor said, "I'm going to ask if Ms. Michelle White indicated who the child was with at the time [the] injury occurred." The Defendant's counsel joined the objection, and the court held a jury-out hearing.

During the hearing, the Defendant's counsel acknowledged that the Defendant told Mr. Pilarski that the Defendant "watched the twins for a minute." However, counsel argued that the State "was then going to ask several other questions in which it would be Ms. So-and-so said this about Mr. Love, and Mr. -- you, know, and it would be the others saying things that maybe he didn't say." The State argued that *Bruton* was not implicated in this situation because the codefendants' statements did not involve "finger pointing." Counsel replied, "I will just say that I know that [the State] and I assume that Mr. Pilarski are going to make the argument that at some point the statements and stories differ widely." The trial court overruled the objection.

When Mr. Pilarski's direct testimony resumed, he described his initial conversations with the Defendant and codefendants Michelle and Barnett. Codefendant Michelle told him that she and codefendants Barnett and Gayle were in the kitchen and that the Defendant brought the children to her after the victim was injured. Codefendant Barnett told Mr. Pilarski that she and codefendants Michelle and Gayle were in the kitchen, heard the children crying, and went into the living room where the children were lying on the sofa. The Defendant told Mr. Pilarski that the children were upstairs on the bed when the injury occurred. Mr. Pilarski described his June 16 in-person interviews with the Defendant and codefendant Michelle, and the recorded interviews were played for the jury. During the Defendant's interview, he stated that he moved the children from the sofa to the upstairs bedroom and that the injury occurred when he went back downstairs. Codefendant Michelle stated in her interview that the children were on the sofa, that the Defendant brought the children to her, and that the victim's mouth was bleeding.

Mr. Pilarski testified that he spoke with codefendant Barnett on July 19, and the recorded interview was played for the jury. During the interview, Mr. Pilarski told her that "there's a lot of things that aren't matching up" and that "everybody's story is completely different." Codefendant Barnett said she was cooking in the kitchen, that she went into the living room when she heard S.W. crying, and that K.W. was bleeding. She said she was positive that the children were on the sofa with the Defendant. Mr. Pilarski reiterated several times that each codefendant's story was different, told codefendant

Barnett that "everybody's hiding something," and suggested that she was trying to protect codefendant Michelle's family. Finally, Mr. Pilarski testified that he spoke with codefendant Gayle on the telephone and that codefendant Gayle said he and codefendant Michelle were in their bedroom, that the Defendant was on the sofa with the children, and that the Defendant brought the children to the bedroom door.

The State argues that "[t]he facts of the current case are dissimilar to *Bruton*, and the application of *Bruton* to the current case is unclear," but we disagree. The non-testifying codefendants' statements in this case circumstantially implicated the Defendant by placing the Defendant alone with the victim at the time the injury occurred, showing the Defendant was responsible for causing the injury. Also, the codefendants' statements placed the children on the sofa at the time of the injury, although the Defendant told Mr. Pilarski that the children were on an upstairs bed. The Defendant was unable to cross-examine the non-testifying codefendants at the trial on these matters. Therefore, *Bruton* prohibited the non-testifying codefendants' statement from being admitted into evidence at the trial. We must now determine whether the error more likely than not affected the jury's verdicts.

A violation of the Confrontation Clause is a non-structural constitutional error. *State v. Antwain Green*, No. M2012-00234-CCA-R3-CD, 2013 WL 624128, at *8 (Tenn. Crim. App. Feb. 20, 2013) (citing *State v. Gomez*, 163 S.W.3d 632, 648 (Tenn. 2005)). In determining whether the error was prejudicial, the State has the burden of establishing beyond a reasonable doubt that the error did not contribute to a defendant's conviction. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008).

The State argues that any error in the present case was harmless because "the statements of the codefendants cannot be construed as so prejudicial as to make a difference in the case." We disagree. Codefendants' Michelle, Barnett, and Gayle each stated to Mr. Pilarski that the children were in the Defendant's care at the time the injury occurred. Likewise, all of the codefendants indicated that the Defendant was downstairs on the sofa with the children when the injury occurred, although the Defendant claimed that the children were on an upstairs bed and that he was downstairs when the injury occurred. The inconsistencies in the codefendants' statements were central to establishing the Defendant's guilt. We note that during closing arguments, the State recounted the codefendants' statements and told the jury that everyone who was present when the injury occurred had "different and conflicting versions" and that "there is no way to reconcile those conflicting versions. One or more of them are lying about what happened." The Defendant, however, had no opportunity to cross-examine codefendants Michelle, Barnett, or Gayle. Furthermore, the evidence presented against the Defendant was circumstantial, not overwhelming. Therefore, we conclude that the error more likely than not affected the outcome of the trial and that the Defendant must receive a new trial.

Because we have previously concluded that the evidence is insufficient to establish serious bodily injury as required for aggravated child abuse and aggravated child neglect, the trial upon remand shall be for the lesser charges of child abuse and child neglect. Likewise, the statement of any non-testifying codefendant shall be excluded from evidence at the new trial.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed. In light of insufficient evidence, the Defendant's convictions for aggravated child abuse and aggravated child neglect accomplished by a dangerous instrumentality are vacated, and the charges are dismissed. In light of insufficient evidence regarding serious bodily injury, the convictions for aggravated child abuse and aggravated child neglect by inflicting serious bodily injury must be vacated. However, because sufficient evidence established the victim suffered bodily injury, the trial court erred by admitting the non-testifying codefendants' statements, and the error was prejudicial, we remand the case to the trial court for a new trial on the lesser charges of child abuse in Count 1 and child neglect in Count 3.

_____
ROBERT H. MONTGOMERY, JR., JUDGE